tion. That proposition, as here applied, is reasoning in a circle. The bonds are brought into the transaction only by force of the supposed estoppel, but the estoppel asserted arises after the transaction, by reason of the avails thereof being taken by the parties supposed to be estopped. They did not share in the avails of the bonds, unless they were included in the transaction; and yet the proposition is that, because the appellees shared in the avails, the bonds must be deemed to have been included. It seems clear to me that, if there was an estoppel, it must be found outside of the transaction to be affected thereby; and, for the reasons already stated, that cannot be. If the supposed pledge failed for want of effective action—there was in fact no action at all, but at most an intention on the part of Hook alone—Marshall P. Ayers and John A. Ayers could, of course, perfect it, as against their own rights, by an agreement to that effect; but such an agreement resting in parol cannot be shown, when the effect is, as here, to vary a contract in writing. It is to be observed that Hook's answer does not attempt to set up an estoppel against Marshall P. Ayers and John A. Ayers. It alleges an outright sale by them to him of their interest in the bonds, for a price paid, and not a sale by force of an estoppel in connection with the actual sale which was made of their interest in the property of the syndicate. The estoppel attempted to be set up is against the three Ayerses, and it is predicated, as against two of them, solely on the alleged sale of their interest in the bonds, and, as against the third, upon his alleged knowledge of that sale at the time it was made. In short, the theory of the answer is that two of the appellees had parted with their interest in the bonds by contract of sale, and that the other was cut off by an estoppel in pais. The answer fails because there was no such contract, and such an estoppel, upon the facts, against Augustus E. Ayers was impossible. Against the other two, no estoppel outside of the contract was pleaded, and, if it had been, it could not have prevailed. Decree affirmed.

---

DADIRRIAN v. GULLIAN et al.

(Circuit Court, D. New Jersey. May 4, 1897.)

EQUITY PLEADING — SUPPLEMENTAL BILL — INFRINGEMENT OF TRADE-MARK — NEW PARTIES.

Complainants, after securing a decree against certain parties restraining the use of a trade-mark, sought by supplemental bill to make parties to the suit others who had purchased the business from the original defendants, and were using the trade-mark, and also certain persons, formerly servants of the original defendants, who had entered the employ of the new users of the mark. It appeared that the original defendants had made no attempt to transfer a right to use the mark, and that the new users of it did not base their claim to use it upon any rights supposed to be derived from the original defendants. Held, that leave to file the supplemental bill should be denied.

Betts, Hyde & Betts, for complainant.
Louis C. Raegener, for defendants.

KIRKPATRICK, District Judge.  Markar G. Dadirrian, the complainant herein, having obtained on decree an injunction against Muggerditch Gullian, Albert Gullian, and Otto Heisenbuttel, trading as M. Gullian & Co., restraining them, their agents and servants, from using the trade-mark "Matzoon" as a label for a fermented milk preparation, asks leave by petition to file a supplemental bill for the purpose of making Senekerim Gullian, Taquhy Gullian, Nazar Gullian, and Reuben Gullian parties to his original suit.  The reasons alleged in the petition are that, pending the suit against M. Gullian & Co., the said M. Gullian & Co. made an assignment and transfer of their business in preparing, putting up, selling, and offering for sale a liquid preparation of fermented milk to Taquhy Gullian, who is the wife of Senekerim Gullian, and the same was accepted by her with full knowledge of the pendency and object of the suit, and that subsequently the property was transferred to Senekerim Gullian, who had like knowledge.  It does not appear that any claim was made by Dadirrian to the exclusive right to manufacture the fermented milk which he sold under the trade-mark of "Matzoon."  His only object in bringing the suit was to protect his right to use his trade-mark in connection with the manufactured article.  He did not object to the manufacture and sale of fermented milk.  That was a business in which any one might engage without hindrance from him, and therefore the sale of the utensils necessary to the carrying on of that legitimate business could not afford any ground for making the purchasers parties to a controversy which does not necessarily pertain to the business.  It does not appear that M. Gullian & Co. undertook to convey to Taquhy Gullian any right to use the trade-mark "Matzoon," which was the subject-matter of the suit, or that she ever made use of the word "Matzoon" in selling the product of her business; on the contrary, it is admitted that Taquhy, after the decree and injunction had been obtained by Dadirrian, changed its name to "Lebben."  Recently it is said that Senekerim Gullian has come into possession of the business and appliances so purchased by his wife, Taquhy, and that he is now engaged in manufacturing fermented milk, and is selling it under the name of "Matzoon," but he does not claim to so call it by virtue of any right derived either from his wife, Taquhy, or M. Gullian & Co.  The other persons named in the petition—Nazar Gullian and Reuben Gullian—were servants of M. Gullian & Co., and have ceased to be such.  They are now in the employ of Senekerim.  No other reason is advanced why they should be made parties except that they are the sons of Muggerditch Gullian, and live in the same house with him, and Senekerim, their brother.  I have already held that Senekerim Gullian was carrying on this business on his own behalf, and in good faith, and that neither he nor his brothers, Nazar and Reuben, though once the servants of their father, Muggerditch, were bound, having ceased to be such servants, to obey the injunction granted in the suit to which they were not parties.  They should not, more than other strangers, be in any way concluded by the decree, but be permitted to have their day in court to offer such defenses to their actions as they may be advised.  The purchase by Senekerim of the utensils

• ·to manufacture the articles which he now offers for sale, even though ·it were from M. Gullian & Co. direct, cannot change his status or impair his rights. ˙ The injunction was issued, not to prevent the manu· facture and sale of fermented milk, but to forbid the use of the trade-mark "Matzoon" as an aid in procuring purchasers. It is true that Senekerim is now using the prohibited word for that purpose, but he does not base his right upon any grant or transfer from M. ·Gullian & Co., the defendants, but upon the ground that Dadirrian, the complainant, has .no exclusive privilege to do so. Leave to file ·the supplemental bill is denied.

---

PEIRCE v. BANE.

(Circuit Court of Appeals, Seventh Circuit. June 8, 1897.)

No. 347.

MASTER AND SERVANT—RAILROAD APPLIANCES—ASSUMPTION OF RISK.
    A railroad company or a receiver operating a railroad owes no duty to its or his servants to provide cars or engines of but one pattern, and any risk arising from an obvious difference in construction of particular cars or engines from those to which they are accustomed is assumed by such servants.

In Error to the Circuit Court of the United States for the South-·ern District of Illinois.

The injury which was the subject-matter of this action happened to George Bane, the defendant in error, while in the service of the receiver of the Toledo, St. Louis & Kansas City Railroad Company, in the capacity of brakeman upon freight trains. On the 18th day of January, 1895, at about 4 o'clock p. m., the defendant in error and the train crew were summoned at Frankfort, Ind., ·to take charge of a through freight train destined for Charleston, Ill. At that time he was notified that a certain switch engine, which had then just · ·come from the repair shops at Frankfort, and was standing on a siding, was to be taken out in the train as a "dead engine"; that is, an engine without steam, and not doing active work. This engine was to be taken to Charleston for service there in switching. It was constructed with a sloping tank, extending to within two feet of the rear end of the tender, and with a footboard at the rear end of the tender, being in length a foot and 5 inches less than the width˙ of the engine, and being 14 inches above the rails. Above this footboard, and upon the floor of the tender, were two hand rails, each about 2 feet long, one upon each side of the drawbar, with a space of 10 inches between them. These were placed 15 inches back from the rear end of the floor of the tender, and 30 inches back from the end of the drawbar. This switch engine, being in perfect repair, was placed in the freight train with six ·or eight freight cars between it and the locomotive that hauled the train and .a number of miscellaneous freight cars behind it. The defendant in error, as head brakeman, was placed at the head end of the train. When near Cayuga, and going up a steep incline, known as "Cayuga Hill," the train, in order to surmount the hill, was parted into two sections. The first section proceeding up the incline became uncoupled immediately behind the dead switch engine, by reason of the pin in the coupler rising, and letting out the link. The con·ductor and the defendant in error at this time were at the rear end of the ·section, some three cars behind the dead engine, and, upon the uncoupling of this section, applied the brakes to bring the rear portion of the section to a stop. Bane then descended, and signaled to the engineer to back up. As the front part of the section returned, he went towards it, stepped upon the foot-board of the dead engine, and, when the two parts of the section came to-·gether, he coupled them with the pin, which still remained in the drawbar